# Bromberg Law Office, P.C.

Brian L. Bromberg (Admitted in NY & CA)
Jonathan R. Miller, Associate (Admitted in NY, MO & NC)

26 Broadway, 21st Floor
New York, NY 10004
Phone: (212) 248-7906
Fax:    (212) 248-7908

June 13, 2016

Via ECF
Hon. Amalya L. Kearse, Hon. Reena Raggi, and Hon. Richard C. Wesley
United States Court of Appeals – Second Circuit
Thurgood Marshall U.S. Court House
40 Foley Square
New York, NY 10007

Re:     *Strubel v. Comenity Bank*, Court of Appeals Docket No. 15-528

Dear Judges Kearse, Raggi, and Wesley:

The Supreme Court issued its decision in *Spokeo, Inc. v. Robbins* on May 16, 2016.[1]

Under *Spokeo*, the failure of Defendant-Appellee Comenity Bank ("Defendant" or "Comenity")

to provide Plaintiff-Appellant Abigail Strubel ("Plaintiff" or "Strubel") with the disclosure

required by the Fair Credit Billing Act ("FCBA") is a concrete invasion of a legally protected

interest that fulfills Article III's injury-in-fact requirement.

## I.     *Spokeo* does not change the test for determining constitutional standing.

When laying out the elements of constitutional standing, *Spokeo* cites approvingly to

*Lujan v. Defenders of Wildlife*,[2] which remains the seminal case.[3] The only element at issue here

is the injury-in-fact requirement, which is itself composed of several elements: "[A] plaintiff

must show that he or she suffered [1] an invasion of a legally protected interest that is [2]

concrete and [3] particularized and [4] actual or imminent, not conjectural or hypothetical."[4]

*Spokeo* is a reminder that the point of constitutional standing is not to protect defendants,

---

[1] 136 S. Ct. 1540 (2016).
[2] *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).
[3] *Spokeo*, 136 S. Ct. at 1547 (citing to *Lujan*, 504 U.S. at 560-61).
[4] *Spokeo*, 136 S. Ct. at 1548 (citing to *Lujan*, 504 U.S. at 560) (internal quotation marks omitted; numbered points added).

but to protect the constitutional separation of powers.[5] By weeding out disputes that do not fit the definition of "case or controversy," "the law of Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches . . . ."[6] For example:

- Citizens who wanted to fight a policy decision by a federal agency to give away property to a religious college could not wage that battle in a courtroom; instead, they would have to fight it using the other tools and procedures available to citizens in a democracy (including voting and free speech).[7]

- Citizens who wanted to fight a political decision by a municipal zoning board that would hurt low- and moderate-income residents could not wage that battle in a courtroom; instead, they would have to fight it using the other tools and procedures available to citizens in a democracy.[8]

- Citizens who wanted to fight a policy to tap the phones of people outside the United States could not wage that battle in a courtroom; instead, they would have to fight it using the other tools and procedures available to citizens in a democracy.[9]

In these cases, "[r]elaxation of standing requirements [was] directly related to the expansion of judicial power . . . ."[10]

Yet *Spokeo* suggests another possible danger. While it is true that "[i]n no event may Congress abrogate the Art. III minima,"[11] the judiciary can also diminish the legislative power granted by the Constitution by demanding *more* than the Article III minima. By tightening

---

[5] *Spokeo*, 136 S. Ct. at 1547 ("The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood.") (citing to *Raines v. Byrd*, 521 U.S. 811, 820 (1997)).

[6] *Spokeo*, 136 S. Ct. at 1547 (citing to *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013)).

[7] *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982).

[8] *See Warth v. Seldin*, 422 U.S. 490 (1975).

[9] *See Clapper v. Amnesty Int'l USA* 133 S. Ct. 1138 (2013).

[10] *Id.* at 1147 (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974)).

[11] *Spokeo*, 136 S. Ct. at 1548 (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) (internal quotation marks omitted).

standing requirements too much, a court might needlessly bar plaintiffs from exercising a congressionally created private right of action. Ironically, then, a doctrine designed to limit the judicial power can become a vehicle to unwittingly usurp the power of the legislative branch.

*Spokeo* emphasizes that it is the job of Congress, as wielder of the legislative power, to create rules – and, if it so chooses, to create private causes of action that redress violations of those rules.[12] And, constitutionally, Congress is empowered to protect citizens from intangible as well as tangible harms.[13] The power of the democratically elected legislature is not limited to enacting rules previously enshrined in the common law; rather, Congress has a "role in identifying and elevating intangible harms . . . ."[14] This is because Congress, the branch of the government closest to the people, "is well positioned to identify intangible harms . . . ."[15] The only constitutional limit on Congress's power to create private causes of action is that it may not force upon the judicial branch disputes that are not particular, concrete, and actual or imminent. This prevents Congress from dressing up a nonjusticiable political disagreement in the garb of a private cause of action – as it attempted to do when it gave individual members of Congress a private right of action to challenge the constitutionality of the Line Item Veto Act.[16]

Justice Thomas's concurring opinion in *Spokeo* makes a similar point:

> Common-law courts more readily entertained suits from private plaintiffs who alleged a violation of their own rights, in contrast to private plaintiffs who asserted claims vindicating public rights. Those limitations persist . . . . These limitations preserve separation of powers by preventing the judiciary's entanglement in disputes that are primarily political in nature. . . . [T]he concrete-harm requirement does not apply as rigorously when a private plaintiff seeks to vindicate his own private rights.[17]

---

[12] *Spokeo*, 136 S. Ct. at 1549-50 (Part II.B.2).
[13] *See Id.* at 1549.
[14] *Id.*
[15] *Id.*
[16] *See Raines v. Byrd*, 521 U.S. 811 (1997).
[17] *Spokeo*, 136 S. Ct. at 1550-52 (Thomas, J., concurring).

3

In short, the Constitution's separation of powers is threatened *both* by standing requirements that are too loose *and* by standing requirements that are too strict; whether the former danger or the latter danger is more urgent depends on the facts of the case. In *Valley Forge Christian College*, *Warth*, *Clapper*, and *Raines*, where plaintiffs tried to dress up policy disputes with political branches in judicial garb, the former danger predominated. But in cases like *Spokeo* and this Appeal, which center on private actors' failures to live up to a legal duties owed to other private actors, there is also a danger that, by requiring more than the Article III minima, a court will frustrate a congressional plan to prevent certain harms.

## II. Particularity and concreteness are two separate analyses.

*Spokeo* clarifies that particularity and concreteness are two distinct elements of injury in fact, requiring two different analyses. Particularity requires that the invasion of the legally protected interest alleged by the plaintiff "must affect the plaintiff in a personal and individual way,"[18] while concreteness means that the invasion of the legally protected interest alleged by the plaintiff must be "real, and not abstract."[19] Crucially, however, the Supreme Court emphasized that the invasion need not be "tangible" in order to be considered concrete.[20]

Congress plays an important constitutional role in deciding whether to extend legal protection to an intangible interest.[21] Congress may not grant private plaintiffs the right to sue over a "bare procedural violation."[22] What Congress *can* do, however, is to grant private plaintiffs the right to sue over a procedural violation that "cause[s] harm or present[s] . . .

---

[18] *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, n.1).
[19] *Spokeo*, 136 S. Ct. at 1548 (citations and internal quotation marks omitted).
[20] *Id.* at 1549.
[21] *See Id.*
[22] *See Id.* at 1549-50.

material risk of harm."[23]

### III. Application

Here, Plaintiff demonstrates all elements of injury in fact. The first element – actuality or imminence – is not an issue. Comenity was under a legal duty to supply the disclosure at the front end of its contractual relationship with Strubel; by delivering a faulty disclosure, Comenity breached that duty. Thus, there has already been an actual invasion of the protected interest.

Second, Plaintiff fulfills the particularity requirement. Her Complaint does not center on "violations of the duties that [Comenity] owes to the public collectively . . . ."[24] To the contrary, Comenity violated a duty owed to Strubel *specifically*. An example in Justice Thomas's concurring opinion is instructive. While Justice Thomas suggested that Robins had one viable claim, he also suggested that Robins did *not* have standing to sue over Spokeo's failure to "post a toll-free telephone number on [its] website through which consumers can request free annual file disclosures" – at least without also pleading how it affected Robins in a particular way.[25] Justice Thomas wrote that Robins would not have standing to bring that claim because it would amount to nothing more than an attempt to enforce the duties that Spokeo owed to the general public.

Strubel's claims are different. Comenity was not under a legal duty to educate the general public about the FCBA's dispute resolution procedures by, for example, placing disclosures in a newspaper or on a website. Comenity was under a legal duty to provide a disclosure *specifically to Strubel*, by virtue of the fact that Comenity and Strubel agreed to enter into contract creating a

---

[23] *See Id.* at 1550.
[24] *Spokeo*, 136 S. Ct. at 1553 (Thomas, J., concurring).
[25] *Id.* at 1553-54.

5

credit card account.[26] For this reason, Strubel fulfills the particularity requirement.

Third, Strubel and her claims meet the concreteness requirement. Numerous courts have held that being deprived of information that should have been contained in a disclosure required by law is sufficiently concrete to confer standing.[27] All of those precedents remain in force since, as discussed above, *Spokeo* does not purport to alter existing law. Under longstanding precedent, then, Strubel need show nothing more; her allegation that Comenity failed to deliver the mandatory disclosure, standing alone, is all that is needed to confer standing.[28] In other words, Comenity deprived Strubel of her substantive right to disclosure of FCBA's protections – this was not a "procedural violation" of the type that the Supreme Court addressed in *Spokeo*.

But even assuming that Comenity's failure to provide information is a "procedural violation," the concreteness requirement is met, because the violation exposed her to a material

---

[26] *See* 15 U.S.C. § 1637(a) ("Before opening any account under an open end consumer credit plan, the creditor shall disclose to the person to whom credit is to be extended each of the following items . . . .").

[27] *See, e.g.*, *Pollard v. Law Office of Mandy L. Spaulding*, 766 F.3d 98, 102-03 (1st Cir. 2014) (holding that failure to provide disclosure required by § 1692g of the FDCPA satisfied injury-in-fact requirement); *Charvat v. Mutual First Fed. Credit Union*, 725 F.3d 819, 823 (8th Cir. 2013) (holding that failure to provide disclosure required by Electronic Fund Transfer Act satisfied injury-in-fact requirement); *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 386-87 (5th Cir. 2003) (holding that failure to deliver disclosures required under Nursing Home Reform Amendments constituted "concrete and palpable" injury); *DeMando v. Morris*, 206 F.3d 1300, 1303(9th Cir. 2000) (holding that failure to provide disclosure required by TILA satisfied injury-in-fact requirement); *Alvarez v. Longboy*, 697 F.2d 1333, 1338 (9th Cir. 1983) (holding that failure to deliver disclosures required under Farm Labor Contractor Registration Act met injury-in-fact requirement); *Arlen Realty & Dev. Corp*, 540 F.2d 645, 649-50 (4th Cir. 1975) (holding that failure to provide disclosures required by § 1637 of TILA was injury-in-fact).

[28] Failing to provider a legally required disclosure is a subset of a type of injury known as "informational injury." *Spokeo* reaffirmed that informational injuries meet the injury-in-fact requirement. *See Spokeo*, 136 S. Ct. at 1549 (citing to *Federal Election Comm'n v. Akins*, 524 U.S. 11, 20-25 (1998) and *Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989)). *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982); *Doe v. Public Citizen*, 749 F.3d 246, 263(4th Cir. 2014); *Grant v. Gilbert*, 324 F.3d 383, 387 (5th Cir. 2003); *Heartwood v. United States Forest Serv.*, 230 F.3d 947, 952 n.5 (7th Cir. 2000); *Public Citizen v. Federal Trade Comm'n*, 869 F.2d 1541, 1543 (D.C. Cir. 1989)

6

risk of harm that Congress intended to prevent. As explained in Strubel's previous briefing, the FCBA amended TILA to give credit card holders two new, powerful protections, establishing a billing error resolution procedure, and abolishing the holder-in-due-course doctrine as to credit cards. Strubel has already discussed, on pages 18-22 of her Appellant Brief, Congress's investigation into the harm caused to consumers both by credit card billing errors, complete with quotations from congressional floor debates and hearings. In short, Congress collected significant evidence demonstrating that credit card billing errors were causing substantial harm, as explained in the Senate Report accompanying one of the FCBA's precursor bills:

> Numerous complaints have been received by . . . Congress from consumers using credit cards who have had difficulty in resolving errors appearing on their monthly credit statements. The Federal Trade Commission has received nearly 2,000 complaints in this area. Similar complaints have been received by consumer protection agencies throughout the country. A survey taken by the Minneapolis Tribune shows that one out of every three consumers have been involved in a least one billing problem.[29]

The Appellant Brief spent less time detailing Congress's investigation into the serious harm that the holder in due course doctrine caused consumers, but a review of the legislative history shows that Congress thoroughly considered that harm:

- The Chairman of the Federal Trade Commission ("FTC"), testified in support of abolishing the holder-in-due-course doctrine as to credit card purchases, saying, "I wish to point out that the Commission conducted public hearings this past month on a proposed trade regulation rule to abolish the doctrine with reference to consumer installment sales. *The premise of our rule is that the holder in due course doctrine has caused substantial injury to consumers.*"[30]

---

[29] S. REP. NO. 93-278, at 5 (1973).

[30] *Fair Credit Billing: Hearing Before the S. Subcomm. on Fin. Insts.*, 92d Congress. 97 (1971) (statement of Miles Kirkpatrick, Chairman of the United States Federal Trade Commission) (emphasis added). *See also* (emphasis added) See also Promulgation of FTC Holder Rule, 40 Fed. Reg. 53,506-53530 (explaining evidentiary basis for abolition of holder in due course as to

- Among the evidence entered into the record was an Associated Press news article, which included real-life examples of the harm that the holder-in-due course doctrine had caused consumers, and which quoted a National Consumer Law Center attorney who called holder in due course "a tremendous umbrella protection for fraud."[31]

- One witness – a lawyer with 40 years' experience representing banks – submitted written testimony that stated, "I think there is no question that an unlimited holder in due course concept has produced and can produce serious abuses on consumers."[32] Senator Proxmire, a sponsor of the bill that became the FCBA, noted this statement during a hearing, and used it as a point of departure for extended questioning of the witness.[33]

- Fairfax Leary, a law professor who was also a fellow at the Public Interest Research Group, testified extensively concerning the need to abolish holder in due course.[34]

- Professor John Spanogle, testified in favor of abolishing holder in due course. He cited as an example of why it should be abolished the case of a fly-by-night company called Astro Sales Corporation, which invited consumers to use their credit cards to pay $89.50 for 10-year service contracts before disappearing.[35] Professor Spanogle also testified that, absent congressional action, the banking industry would be unlikely to take action to protect consumers, "because the merchant and the consumer are not equals in the bank's view."[36]

- Senate Report 93-278, which accompanied one of the FCBA's precursor bills, discussed the need to abolish holder in due course, stating that a "*serious problem for consumers arises out of the growing use of three-party credit card transactions . . . . [I]t is likely that some consumers will end up paying unjust*

---

installment contracts). *Available online at* https://www.ftc.gov/policy/federal-register-notices/16-cfr-433-promulgation-trade-regulation-rule-statement-basis.

[31] *Fair Credit Billing: Hearing Before the S. Subcomm. on Fin. Insts.*, 92d Congress. 131 (1971) (article by G. David Wallace submitted for record).

[32] *Id.* at 169 (statement of attorney Walter D. Malcolm).

[33] *Id.* at 156-58 (statements of attorney Walter D. Malcolm and Sen. William Proxmire).

[34] *Id.* at 258-262 (statement of Prof. Fairfax Leary, Jr.).

[35] *Id.* at 284. (statement of Prof. John A. Spanogle).

[36] *Id.* at 285.

bills under three-party credit transactions."[37]

- On the Senate floor, Senator Proxmire explained in detail how the holder-in-due-course doctrine caused considerable injury to consumers, and why it should be abolished as to credit cards.[38]

Strubel's allegations do not go to 15 U.S.C. § 1666's billing error resolution procedure or § 1666i's abolition of holder in due course. Rather, Strubel alleges that Comenity violated § 1637's requirement that creditors disclose information concerning those two protections. *But § 1637's disclosure requirement is a vital part of Congress's plan to make those protections a reality for consumers.* Section 1637's disclosure requirement is necessary to effectuate the purposes of §§ 1666 and 1666i, because their protections are useless if card holders do not know about them. Moreover, as explained in Strubel's Appellant Brief, both of the FCBA's consumer protections are subject to important limitations. For example, § 1666i's preservation-of-claims rule does not cover purchases made with convenience checks that access a consumer's credit-card account, nor does it cover purchases made with cash advances. It also does not cover charges that consumers have already paid off. And to adequately preserve their claims and defenses, consumers must notify the credit card issuer in writing. Finally, a consumer might lose the right to dispute a billing error under § 1666 if he or she does not cancel an automatic payment at least three days in advance. Consumers who do not know about these limitations – or who misunderstand them – could easily be misled into waiving their FCBA rights. Congress acted to prevent that harm by including a disclosure requirement in FCBA. Comenity, by failing to disclose those limitations, created a material risk that Strubel would waive her FCBA rights.

Comenity also failed to disclose that Strubel was entitled to an acknowledgement of any billing error dispute within 30 days, regardless of whether Comenity intended to correct the

---

[37] S. REP. NO. 93-278, at 9-10 (1973) (emphasis added).

error. As explained in Strubel's Appellant Brief, the harm that Congress intended to prevent when it enacted § 1666 was more than just financial – Congress also intended to eliminate the confusion, frustration, worry, and general emotional distress that thousands of consumers were experiencing because their complaints over billing errors were disappearing into figurative black holes. Section 1637's disclosure requirement was designed to prevent that same confusion, frustration, and worry. Consumers whose complaint disappears into a black hole, but who fully understand their right to an acknowledgment under § 1666, are at least buoyed by the knowledge that the credit card issuer is in the wrong – and that they can now bring actions against the credit card issuer for violating their right to the resolution procedure. Comenity's failure to fully disclose their obligations exposed Strubel to a risk of needless confusion, frustration, and worry.

The risks Congress sought to prevent by requiring disclosure of FCBA's protections are intangible to be sure. Yet Congress – observing specific harms it wanted to prevent – instituted a billing error dispute procedure and abolished the holder-in-due-course doctrine. Then, reasoning that these two substantive provisions alone would not adequately guard against those harms, Congress created a right to receive effective disclosure of those provisions, exactly when that information would be the most useful: at the front end of the contractual relationship.

For these reasons, the invasion alleged by Strubel in her Complaint is concrete. Because she fulfills all requirements of constitutional standing, Plaintiff respectfully asks this Court to reverse the decision of the district court and to remand for further proceedings.

Respectfully,

/s/ Jonathan R. Miller
Jonathan R. Miller

cc:     All counsel of record (Via ECF)

---

[38] 118 CONG. REC. 14,805-14,808 (Apr. 27, 1972) (statement of Sen. William Proxmire).